John C. MEEHAN, Plaintiff-Appellant,

v.

PPG INDUSTRIES, INC., Defendant-Appellee.

No. 85–2495.

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1986.

Decided Sept. 26, 1986.

Lloyd W. Mason, Wood Dalton Phillips Mason & Rowe, Chicago, Ill., for plaintiff-appellant.

Madeline Henricks Devereux, Marshall O'Toole Gerstein Murray & Bicknell, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, BAUER and FLAUM, Circuit Judges.

CUMMINGS, Chief Judge.

Plaintiff brought this breach of contract action in 1984 when defendant stopped making him royalty payments for sales of his invention. The contract involved an assignment of rights in a "method and apparatus" invented by the plaintiff. The three patents on plaintiff's invention have since expired. Although the contract required defendant to make royalty payments to plaintiff until the expiration of all patents, defendant refused to pay royalties for sales in the United States after the expiration of the only United States patent.

Both parties brought motions for summary judgment. On July 3, 1985, the district court granted defendant's motion and denied plaintiff's motion. Plaintiff then brought this appeal. The sole issue on appeal is whether the district court correctly decided that the royalty provisions of the contract were unenforceable as a matter of federal patent law. We affirm the order of the district court.

The facts in this case are undisputed. The plaintiff, John Meehan, invented a method and apparatus for the packaging and dispensing of anti-icing products, which when added to fuels in internal combustion engines prevent ice formation. In a contract executed January 30, 1964, Meehan conveyed exclusive rights in the invention to Hoffman-Taff Corporation. Hoffman-Taff's rights and obligations under the

agreement were subsequently assumed by defendant PPG Industries.

At the time that the agreement was entered into Meehan had not filed a patent application for the invention. But the contract did require PPG to determine immediately whether the invention was patentable and, if so, to pursue an application for a U.S. patent. Meehan was required to assist in a technical capacity, as well as to furnish the necessary information and complete the necessary documents in the patent application process. The contract also transferred the patent, once it issued, to PPG.

Ultimately patents were granted in the United States, Canada, and the United Kingdom. The three patents expired in the following sequence: British patent, November 11, 1981; U.S. patent, January 4, 1983; Canadian patent, December 19, 1984. Since the U.S. patent expired, PPG has made no royalty payments on sales of plaintiff's invention in the United States.

Meehan sued PPG for breach of contract in 1984. The contract was interpreted as requiring PPG to continue paying plaintiff royalties on all sales until the last patent expired, or in December of 1984. PPG defended, asserting that any obligation it had to continue paying plaintiff royalties beyond the life of the U.S. patent was unenforceable under federal patent law. The district court agreed with PPG and granted summary judgment in its favor. We affirm.

1. Discussion

Article I § 8 of the Constitution empowers Congress to grant inventors limited monopoly rights in their discoveries. Congress exercised that power by giving inventors the right to exclude others from making, using, or selling the idea for 17 years. 35 U.S.C. § 154. The policy behind this federal patent law is to give a 17–year monopoly to inventors in exchange for release of the invention to the public upon expiration of the patent. *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 255, 66 S.Ct. 101, 104, 90 L.Ed. 47; *Singer Mfg.*

*Co. v. June Mfg. Co.*, 163 U.S. 169, 185, 16 S.Ct. 1002, 1008, 41 L.Ed. 118. Thus for a limited time the inventor may profit exclusively from the invention on condition that the invention goes public after 17 years. Even this limited monopoly right has extensive social and economic consequences for the public and therefore the courts are ever watchful of the possibility that patent monopolies will overstep their bounds. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381. Consequently the policy and purpose of the patent laws is undermined by any attempt to extend or preserve the patent monopoly beyond the 17 years. *Scott Paper*, 326 U.S. at 255–56.

Accordingly, in *Brulotte v. Thys Co.*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99, the Supreme Court held that licensing agreements extending royalty payments beyond the life of an issued patent were unlawful. In *Brulotte*, an owner of patents on hop-picking techniques sold machines to farmers for a flat sum. With each sale the owner also executed a licensing agreement requiring payment of a royalty. All of the patents expired before the licenses; nonetheless, the terms of the licenses remained identical both before and after the last patent expired. When the hop farmers eventually refused to pay the royalties, the owner sued to enforce the licenses under state contract law. The farmers defended claiming misuse of the patents. The Supreme Court held that the owner had improperly used the leverage of his patent to extend the monopoly. *Id.* at 32, 85 S.Ct. at 179. The Court based its conclusion on the unchanging nature of the license agreement terms after the patent expired; continuation of patent protection limitations and identical amounts of royalties due. *Id.* Because the terms failed to distinguish between the pre-expiration and post-expiration periods, the Court was unable to determine whether or not the post-expiration royalties were subject to the leverage of the patent. *Id.* Without evidence that the post-expiration royalties were not tied to

the patent, the Court assumed that they were. "In light of those considerations, we conclude that a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se.*" *Id.*

The Eleventh Circuit's decision in *Pitney Bowe's, Inc. v. Mestre,* 701 F.2d 1365 (1983), certiorari denied, 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 230, applied *Brulotte's* rule of *per se* invalidity to an agreement specifically encompassing both patent and trade secret rights and where the patents were only pending at the time the agreement was entered into. In *Pitney,* the inventor had applied and was awaiting patents for his inventions. The prospective patent owner executed four licenses granting exclusive right to make and sell different paper-handling machines. Like *Brulotte,* the royalty and use provisions did not distinguish between rates of payment for the pre-expiration and post-expiration periods or between royalties attributable to patent rights and those for trade secret rights. These hybrid royalty payments extended beyond the life of the patent. The Eleventh Circuit ruled that once the patent issued, the conflicting and indistinguishable trade secret provisions were unenforceable. Thus the *Pitney* Court held that misuse of the leverage afforded by a pending patent was subject to the *Brulotte* rule of *per se* invalidity. See also *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 264–65, 99 S.Ct. 1096, 1100–01, 59 L.Ed.2d 296. In *Pitney,* the court reasoned that the anticipation of the issuance of a patent provided sufficient bargaining power to warrant application of the *Brulotte per se* analysis.

The Sixth Circuit, relying on *Brulotte* and *Pitney,* took the analysis one step further in *Boggild v. Kenner Products,* 776 F.2d 1315 (6th Cir.1985), certiorari denied, — U.S. —, 106 S.Ct. 3284, 91 L.Ed.2d 573. *Boggild* involved a set of facts remarkably similar to the case presented before this Court. In *Boggild,* the plaintiffs invented a toy extruder to be used with Play-Doh. These plaintiffs sold an exclusive license to make, use, and sell the extruder to Kuto/Products, which subsequently assigned its rights to Kenner Products. No patents for the extruder had been applied for when the agreement was executed. However, the agreement required the plaintiffs to apply promptly for mechanical and design patents on the extruder. Patents were subsequently issued. The agreement required Kenner Products to make royalty payments for 25 years, regardless of whether the patents issued. The Sixth Circuit held that the *Brulotte* rule of *per se* invalidity precluded enforcement of license terms that were entered into in anticipation of patent protection and that required royalty payments beyond the life of the patent. *Id.* at 1319. Because the agreement did not contain provisions for reduction of post-expiration royalties and because the use restrictions on the extruder were the same in the post-expiration and pre-expiration periods, it was held unlawful. *Id.* at 1321.

*Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 99 S.Ct. 1096, 1097, 59 L.Ed.2d 296, is not to the contrary. In *Aronson,* the Supreme Court reversed an Eighth Circuit decision applying *Brulotte* to an agreement in which the patent applications, although anticipated, ultimately failed. The *Aronson* Court held that absent an issued patent, federal patent law will not preempt state contract law. *Id.* at 265, 99 S.Ct. at 1100–01. The Court explicitly noted, however, that had the patent issued, enforcement of the royalty for exclusive rights beyond the life of the patent would have been precluded. *Id.* at 263–64, 99 S.Ct. at 1099–1100.

## 2. Application of Law to Facts

■ We agree with the Sixth Circuit's holding that the *Brulotte* rule should be extended to agreements entered into in anticipation of applying for patents. The plaintiff raises three arguments against the application of *Brulotte:* (1) plaintiff sold only trade secret rights, not patent rights; (2) the royalty payments merely constituted installment payments for the full contract price of the trade secret; (3)

there was no patent issued at the time the contract was entered into.

■ Meehan first argues that the contract was for the sale of a trade secret, not the sale of patent rights. The terms and language of the agreement simply do not bear that out. The contract uses the term "invention" when identifying what Meehan is selling; nowhere in the contract is the term "trade secret" mentioned. The term "royalties" is also used when describing the payments Meehan will receive under the contract. Moreover, the contract expressly transfers the right to apply for and obtain a patent in ¶ 2. Obviously, much more than mere trade secrets was conveyed under this contract.

■ Meehan then argues that the right to apply for a patent is not a patent right. Therefore, the argument continues, this contract does not involve a transfer of patent rights and *Brulotte* does not apply. This is but semantics; Meehan transferred the only patent interest he had at the time. What plaintiff fails to recognize is that *Brulotte* is not concerned with restrictions on the sale of patent rights but rather the impact of such arrangements on the policies and purposes of the federal patent laws. Meehan could not have transferred a "patent right" because he did not have one yet. It is the issuance of the patent that triggers *Brulotte's* application, not the transfer of the rights. See *Boggild*, 776 F.2d at 1319; see also *Aronson*, 440 U.S. at 261, 99 S.Ct. at 1098–99.

■ Meehan next contends that the provision for royalty payments is merely an installment method of paying the full contract price of his trade secret. Several facts refute that explanation. Royalty payments by their nature are variable and depend on the market success of the invention; this belies the notion that some set contract price was agreed to and instead suggests that the payments were for use of the product during the post-expiration period. See *Brulotte*, 379 U.S. at 31, 85 S.Ct. at 178–79. Also, the contract specified that if no patent issued, then payments would cease in 10 years; if anything represents the value of the trade secret it would be only ten years of "installment" payments. Furthermore *Brulotte* has explicitly rejected Meehan's argument. *Brulotte* stated that when the license provisions fail to distinguish between post- and pre-expiration royalty amounts, the royalties do not constitute deferred payment for use during the pre-expiration period or long-term payments on a sale of unpatented products. 379 U.S. at 31–32, 85 S.Ct. at 178, 179. Identical payments in the post-expiration period are "a telltale sign that the licensor was using the licenses to project its monopoly beyond the patent period. They forcefully negate the suggestion that we have here a bare arrangement for a sale or a lease at an undetermined price, based on use." *Id.* at 32, 85 S.Ct. at 179.

Finally, Meehan advances the argument that because there was no patent at the time the contract was entered into, *Brulotte* should not apply. Two circuit court of appeals decisions directly conflict with that position. In neither *Pitney* nor *Boggild* was a patent issued during the course of contract negotiations. In fact, *Boggild* explicitly held that the *Brulotte* rule applied to license provisions developed in anticipation of patent protection. And like *Boggild* the parties in this case obviously anticipated patent protection for Meehan's invention.

Even when an inventor has not yet applied for a patent, the right to apply for and obtain those protections is valuable.[1] Such a right places the inventor in a strong bargaining position. It is that abuse of that leverage over which the Supreme Court expressed concern in *Brulotte*. We agree with the Sixth Circuit that:

> the same violations of patent law arising from abuse of the leverage attached to a pending or issued patent can arise from

1. Under the patent laws normally only the inventor may apply for a patent. *See* 35 U.S.C. §§ 111, 115, 116, 117. Without an agreement like the present one, the manufacturer would have no right to obtain patent protection.

abuse of the leverage afforded by an expressly anticipated application for a patent.

776 F.2d at 1320.

This leverage is apparent from the terms of the agreement. The parties' anticipation and expectation of an issued patent appear throughout the contract. Paragraph 8a, which requires that PPG promptly file and diligently prosecute a patent application, strongly suggests the parties contemplated an early patent application. Paragraphs 8b and 10 required Meehan to remain technical advisor to and provide information assistance to PPG in making the patent application. And in ¶ 6 PPG agreed to pay royalties for only 10 years if no patent issued but for over 17 years (the life of the patent) if a patent issued. The prominence of these terms reveals that the parties negotiated their agreement in anticipation of a forthcoming patent. The terms themselves demonstrate that Meehan exerted considerable leverage from the anticipation of a future patent. "In our view, the absence of a patent application is, under the circumstances, irrelevant to the analysis under *Brulotte.*" *Boggild,* 776 F.2d at 1321.

 The terms of the contract must be examined before deciding whether Meehan abused this leverage from the anticipated patent. As in *Brulotte, Pitney,* and *Boggild,* this contract fails to distinguish between pre-expiration and post-expiration royalties. The exclusive rights conferred by the contract do not change in the post-expiration period. Although it is true, as Meehan argues, that parties can contract for trade secret payments to extend beyond the life of a patent, there must be some provision that distinguishes between patent royalties and trade secret royalties. *Brulotte,* 379 U.S. at 31–33, 85 S.Ct. at 178–79. In this contract not only does the rate of royalty payments remain constant in the post-expiration period, but under the terms of the contract if a patent had not issued payments would have ended after only ten years. If anything, the remaining seven-plus years of payments represent the value of the patent right, not the trade secret rights. Nonetheless, it is the lack of clarity that is dispositive in this case. Under *Brulotte* when royalty payments extend unchanged beyond the life of a patent, patent leverage has been abused and the agreement is unlawful *per se.*

Because the terms of the agreement demonstrate that the plaintiff used his right to obtain a patent to project his monopoly power beyond the patent period, the agreement is *per se* unlawful. Therefore, we affirm the district court's decision.